UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KAREN STORK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 4:11-CV-686 NAB |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Security | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying Karen Stork's ("Stork") application for benefits under

Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and 42 U.S.C. § 1381 *et seq.*

Stork alleges disability due to major depression and post-traumatic stress disorder ("PTSD").

Stork filed a Brief in Support of Plaintiff's Complaint.  [Doc. 9]  The Commissioner filed a Brief

in Support of the Answer.  [Doc. 10]  The parties have consented to the jurisdiction of the

undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).


I.
PROCEDURAL HISTORY

On June 20, 2008, Stork applied for a Period of Disability and Supplemental Security

Income, alleging an onset date of July 16, 2007.  (Tr. 98-108.)  Stork's claim was denied on

initial consideration on August 21, 2008.  (Tr. 42-46.)  Stork requested a hearing in front of an

administrative law judge ("ALJ") on October 21, 2008.  (Tr. 50-51.)  Following a hearing before

the ALJ, the ALJ issued a written opinion on January 20, 2010, upholding the denial of benefits.

1

(Tr. 7-17.)  On March 14, 2011, the Appeals Council denied Stork's request for review.  (Tr. 1-3.)  The ALJ's decision thus stands as the Commissioner's final decision.  Stork then filed this appeal on April 15, 2011.  (Doc. 1.)

## II.
## ADMINISTRATIVE RECORD

**A.      Testimony Before the ALJ**

On December 4, 2009, the ALJ held a hearing and heard testimony from Stork.  (Tr. 18-37.)  Stork was represented by counsel.  (Tr. 20.)  A vocational expert also testified.  (Tr. 33-36.)

**1.  Claimant's Testimony**

Stork testified that she was 50 years old and had a high school diploma.  (Tr. 22.)  Stork stated that she worked as a UPS driver for 15 years.  (Tr. 29.)  She testified that she left UPS because of a nervous breakdown.  (Tr. 23.)  Stork claimed that work-related stresses were the cause of her alleged disability. (Tr. 24.)

Stork testified that she had filed a lawsuit against UPS alleging age discrimination and a hostile work environment.  (Tr. 23.)  Stork stated that she was seeking reinstatement of her job as a driver in that case.  (Tr. 23.)  Stork acknowledged she was actively involved in that suit despite having problems talking about what happened.  (Tr. 27-28.)

Stork claimed that she suffered from major depression.  (Tr. 24.)  She testified that she had problems sleeping more than 6 hours a night (Tr. 32), unpredictable crying spells several times a week (Tr. 24; 29), trouble concentrating (Tr. 28), and suicidal thoughts (Tr. 31).  Stork also testified she suffered from flashbacks that resulted in panic attacks.  (Tr. 30.)  She testified that these panic attacks caused a racing heart, pacing, sweating, nausea, and tiredness.  (Tr. 30.)

Stork testified that she lived in her own house.  (Tr. 23.) She stated her son did the grocery shopping because she did not like going out in public.  (Tr. 26.)  She also stated that she

did some cleaning around the house as well as "easy cooking." (Tr. 25.)  While Stork testified that she sometimes went a week without bathing, she had no problems with her personal care or doing her laundry.  (Tr. 26.)  Stork also stated she had a commercial driver's license.  (Tr. 26.)

Stork testified that she was on sleeping and anti-depressant medications: Seroquil, Zyprexa, and Klonopin.  (Tr. 27.)  She claimed to experience no side effects from these medications.  (Tr. 27.) While Stork testified that she had osteoarthritis, she claimed it did not pose a significant physical problem.  (Tr. 27.)

Stork stated that she was not actively looking for work.  (Tr. 32.) She noted that technically she was still employed because her workmen's compensation case against UPS remained pending.  (Tr. 32.)

### 2.  Vocational Expert's Testimony

Jerry Magrowski, a vocational expert ("VE"), testified at the hearing.  (Tr. 33-36.)  He testified that Stork's former job as a UPS driver was heavy in exertion and at least semi-skilled. (Tr. 34.)  The ALJ then posed this hypothetical to the VE:

> "[A]ssume an individual of the claimant's age, education, and the same past work experience. This individual has no exertional limitations, but we will limit the individual to performing unskilled work […] which requires no more than occasional contact with the public and co-workers.  Could that individual perform claimant's past work?" (Tr. 34.)

The VE testified that that individual would be unable to perform Stork's past work.  (Tr. 34.) The VE did state, however, that a person with the above limitation could still perform work in jobs that exist in significant numbers in the national economy.  (Tr. 34.)  The VE identified the following jobs that the individual in the hypothetical could perform: (1) factory work, (2) laundry work; and (3) bagger of garments or clothing.  (Tr. 34.)

The ALJ then asked the VE several other hypotheticals.  (Tr. 35.)  He inquired whether the VE's assessment would change if the individual was limited to having no contact with the general public and only occasional contact with coworkers.  (Tr. 35.)  The VE responded that his assessment would not change.  (Tr. 35.)  In the third hypothetical, the ALJ asked if the individual would be able to perform any work in the national economy with the added limitations of needing unscheduled disruptions in the work day due to periods of decompensation that necessitated lying down for extended periods.  (Tr. 35.)  The VE stated that he knew of no job that would allow for those limitations.  (Tr. 35.)

The VE testified that a person with a global assessment of functioning ("GAF") score of 50 would not have the ability to work.  (Tr. 36.)  The VE also stated that an individual with a GAF score of 60 would be capable of performing unskilled work.  (Tr. 36.)

**B.      Medical Records**

On August 15, 2007, Stork was seen by Alan Tamuren, PhD.  (Tr. 288.)  He noted that Stork appeared extremely agitated, her face "one of desperation and defeatism" as she described the harassment she faced at work.  (Tr. 288.)  Dr. Tamuren further described Stork as being tearful, extremely angry, and having feelings of hopelessness, and "feeling bad about herself." (Tr. 288.)  Dr. Tamuren diagnosed Stork with severe clinical depression and recommended she not return to work because she, in his professional opinion, was disabled at that time.  (Tr. 288.) It was anticipated, however, that Stork would be able to return to work "in a reasonable time." (Tr. 288.)

On November 20, 2007, Jennifer Brockman, M.D, examined Stork.  (Tr. 263-64.)  Dr. Brockman found that Stork was "doing much better" since she had last seen her but that she still had significant depression and PTSD symptoms.  (Tr. 263.)  Stork reported feeling slightly less

depressed and anxious.  (Tr. 263.)  Dr. Brockman found that Stork was cooperative, had good

eye contact, appropriate hygiene and dress, and her thoughts were goal directed and appropriate.

(Tr. 263.)  Stork noted that her mother was cooking Thanksgiving dinner and that she (Stork)

would attend and cook a dish.  (Tr. 263.)  Dr. Brockman diagnosed Stork with major depressive

disorder (single episode, severe without psychotic features), PTSD, and anxiety, with a GAF[1]

score of 65. (Tr. 263.)  Dr. Brockman recommended Stork continue taking her current

medication and seeing her counselor, Dr. Tamuren.  (Tr. 264.)

On December 21, 2007, Sanjeev Rao, M.D., saw Stork and diagnosed her with major

depressive disorder (single episode, severe without psychotic features) and a GAF score of 50.

(Tr. 198; 265.)  Dr. Rao noted that Stork reported her mood remained low, she was stressed out,

depressed, slept poorly, and had increased anxiety and crying spells.  (Tr. 198; 265.)

On January 18, 2008, Stork visited Dr. Rao.  (Tr. 197.)  He noted that Stork complained

of low energy, daily crying spells, fragmented speech, and slept excessively.  (Tr. 197.)  Dr. Rao

found that Stork's condition was "essentially unchanged" since her previous visit, with no

changes in her diagnosis.  (Tr. 197.)

On February 8, 2008, Stork saw Dr. Rao. He noted that Stork had no changes in her

diagnosis of major depressive disorder (single episode, severe without psychotic features).  (Tr.

196.)

On February 29, 2008, Dr. Rao indicated in his treatment notes that there had been no

change in Stork's diagnosis of major depressive disorder (single episode, severe without

psychotic features).  (Tr. 195.)

---

[1] The Global Assessment of Functioning (GAF) is a numeric scale used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. DSM-IV 32 (4th ed. 2000). GAF scores from 61 to 70 indicate "some mild symptoms…or some difficulty in social, occupational, or school functioning…but generally functioning well." *Id*. at 34.

On April 16, 2008, Stork visited Dr. Rao.  (Tr. 194.)  He found no change in Stork's diagnosis of major depressive disorder (single episode, severe without psychotic features) and a GAF score at 50.  (Tr. 194.)

On June 9, 2008, Stork saw Dr. Rao.  (Tr. 193.)  Stork complained of increased crying, low energy, anxiety, irritability, and suicidal ideation on and off.  (Tr. 193.)  Dr. Rao found that her sleep had improved and she had less vegetative symptoms.  (Tr. 193.)  Dr. Rao's diagnosis remained unchanged.  (Tr. 193.)

On July 11, 2008, Stork visited Dr. Rao with complaints of increased jitteriness.  (Tr. 192; 257.)  Dr. Rao found Stork's mood anxious and irritable.  (Tr. 192; 257.)  He noted she complained of increased sleeping during the day, vegetative symptoms, and low energy.  (Tr. 192; 257.)  Dr. Rao found no changes in Stork's diagnosis but did decrease her GAF score from 50 to 40.  (Tr. 193; 257.)

On August 20, 2008, Marsha Toll, PSYD, completed a Psychiatric Review Technique form on Stork.  (Tr. 224-34.)  Dr. Toll reviewed Stork's medical records and found that the evidence did not "meet" or "equal" a SSA listing.  (Tr. 234.)  She also noted that Stork failed to return the activities of daily living ("ADL") form, which left Dr. Toll unable to determine Stork's impairment severity, impairment credibility, or to further the case according to sequential evaluation.  (Tr. 234.)  Dr. Toll found that a denial was appropriate based on insufficient evidence.  (Tr. 234.)

On September 20, 2008, Stork visited Dr. Rao.  (Tr. 254.)  He found no changes in Stork's diagnosis and increased her GAF score from 40 to 50.  (Tr. 254.)

On October 24, 2008, Stork visited Dr. Rao.  (Tr. 253.)  Stork reported she was sleeping terribly, had a low appetite, low energy, and anxiety.  (Tr. 253.)  Dr. Rao's diagnosis remained

unchanged. He noted that Stork had a GAF score of 45, a slight decrease from her previous visit. (Tr. 253.)  Dr. Rao recommended Stork start taking Xanax and Klonopin and continue taking Lexapro.  (Tr. 253.)

On December 15, 2008, Stork visited Dr. Rao.  (Tr. 252.)  Stork reported having crying spells.  (Tr. 252.)  She also reported that her anxiety had decreased, she was sleeping well, saw to her personal care regularly, and that her parents were being supportive.  (Tr. 252.)  Dr Rao noted no change in Stork's diagnosis.  (Tr. 252.)  He recommended Stork continue taking her medications and seeing her counselor, Dr. Tamuren.  (Tr. 252.)

On January 27, 2009, Dr. Brockman performed an independent medical evaluation of Stork.  (Tr. 278-87.)  Dr. Brockman noted that Stork was on Prozac and Xanax and had recently been prescribed Prilosec, Lexapro, Klonopin, and Elavil.  (Tr. 280.)  In her mental status evaluation, Dr. Brockman reported that Stork appeared nervous and distraught, fidgeted frequently, had impaired concentration, was forgetful, easily confused, and in a severely depressed mood.  (Tr. 282.)  Stork stated that she no longer had suicidal thoughts but continued to maintain passive thoughts of death.  (Tr. 282.)  Dr. Brockman saw no evidence of psychosis and noted that Stork, while concrete in her thinking, had a below-average intellect.  (Tr. 282.)  Dr. Brockman's diagnosis for Stork was major depressive disorder (single episode, severe without psychotic features), chronic PTSD, and anxiety disorder not otherwise specified with a GAF score of 40.  (Tr. 283.)  Dr. Brockman indicated that Stork continued having severe symptoms despite having "strong family support, excellent treatment compliance, and [an] intensive level of care."  (Tr. 283.)  Dr. Brockman felt that Stork's condition had reached maximum medical improvement.  (Tr. 284.)  Dr. Brockman also determined that Stork's condition significantly impacted her ability to perform activities of daily living and that a return

7

to UPS would lead to an escalation of her symptoms.  (Tr. 284.)  Dr. Brockman's opined that

Stork should undergo vocational rehabilitation to determine whether she was capable of

obtaining and maintaining employment in the open job market given her diagnosed impairments.

(Tr. 284.)  Nonetheless, Dr. Brockman opined that Stork was most likely "totally and

permanently disabled."  (Tr. 284.)

On February 13, 2009, Dr. Rao's treatment notes indicate that Stork had a GAF score of

45.  (Tr. 251.)  Stork continued to complain of daily crying spells, anxiety, poor sleep, loss of

appetite, and low energy.  (Tr. 251.)

On March 20, 2009, Stork visited Dr. Rao.  (Tr. 250.)  Dr. Rao noted no change in her

diagnosis.  (Tr. 250.) Stork reported sleeping poorly and suffering from anxiety, frustration, low

moods, crying spells, suicidal thoughts, and a decrease in personal care.  (Tr. 250.)

On May 29, 2009, Dr. Rao's progress notes indicated Stork had severe major depression

(single episode without psychotic features) with an assessed GAF score of 45.  (Tr. 276-77.)

Stork reported moodiness, having frequent racing thoughts, depression, anger, and irritability.

(Tr. 276.)  Stork denied having panic attacks.  (Tr. 276.)  Stork also indicated she had difficulty

getting out of bed and functioning as well as poor personal care.  (Tr. 276.)

On June 23, 2009, Dr. Rao again diagnosed Stork with severe major depression (single

episode without psychotic features) and a GAF score of 45.  (Tr. 273.)

On July 20, 2009, a state agency reviewing agent Richard Kasper, PhD, prepared a

Psychiatric Review Technique form on Stork.  (Tr. 235-45.)  He rated Stork's functional

limitations ("B" criteria) as being mild in regards to activities of daily living, social functioning,

and concentration, persistence and pace, with no repeated episodes of extended decompensation

of extended duration.  (Tr. 243.)  Dr. Kasper concluded that Stork's impairment was not severe and there was insufficient evidence to indicate otherwise.  (Tr. 245.)

On August 4, 2009, Stork visited Dr. Rao.  (Tr. 270-71.)  Storks complained of anhedonia, helplessness, hopelessness, worthlessness, anxiety, racing thoughts, and occasional suicidal ideation.  (Tr. 270.)  She also reported feeling depressed, irritable, anxious, worried about everything, crying regularly, moody, angry, overwhelmed, difficulty sleeping, and worsening attention/concentration.  (Tr. 270.)  Stork's ADLs were reportedly impaired but unchanged.  (Tr. 270.)  Dr. Rao diagnosed Stork with severe major depression (single episode without psychotic features).  (Tr. 270.)  While Dr. Rao noted that Stork "overall seem[ed] worse" and that she reported having problems with low mood, vegetative behavior, disjointed thinking and work-related stresses, he still gave her a GAF score of 60.  (Tr. 271.)

On October 2, 2009, Stork visited Dr. Rao.  (Tr. 268-69.)  Stork complained of depressed mood, anxiety, regular crying spells, difficulty sleeping, decreased appetite, impaired attention/concentration, and racing thoughts.  (Tr. 268.)  Stork denied feelings of helplessness, hopefulness, worthlessness, and panic attacks.  (Tr. 268.)  Dr. Rao also noted that Stork's ADLs were intact.  (Tr. 268.)  Dr. Rao diagnosed Stork with severe major depression (single episode without psychotic features) and a GAF score of 50-55.  (Tr. 268-69.)

## III.
## LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the

9

claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC"). *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.

---

[2]  "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  *Id.*; 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.   20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled.  *Id. See also* 20 C.F.R. § 416.920(g).  At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform."  *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  The Commissioner must prove this by substantial evidence.  *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled.  "The ultimate burden of persuasion to prove disability, however, remains with the claimant."  *Id.  See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

## IV.
## ALJ DECISION

The ALJ first found that Stork met the insured status requirements of the Social Security Act through March 31, 2013.  (Tr. 12.)  At step one, the ALJ found that Stork had not engaged in substantial gainful activity since July 16, 2007.  (Tr. 12.)  At step two, the ALJ determined that

Stork suffered from the severe impairments of major depression and PTSD.  (Tr. 12-13.)  At step

three, the ALJ concluded that Stork's impairments, while moderate in degree, neither met nor

medically equaled a listed impairment in 20 CFR 404.1520(d), 404.125, 404.1526, 416.920(d),

416.925, and 416.926.  (Tr. 13-14.)  At step four, the ALJ found that Stork had the RFC to

perform a full range of work at all exertional levels with the nonexertional limitation of

performing only unskilled work that did not require contact with the general public and no more

than occasional contact with co-workers (Tr. 14). Because of this limitation, the ALJ found that

Stork could not perform her past relevant work as a UPS driver.  (Tr. 15.)  Nonetheless,

considering Stork's age, education, work experience, RFC, and the vocational expert's

testimony, the ALJ concluded that there were jobs that exist in significant numbers in the

national economy that Stork could still perform with her limitations.  (Tr. 16.)  Consequently, the

ALJ found Stork was not disabled within the meaning of the Social Security Act.  (Tr. 17.)

## V.
## DISCUSSION

Stork alleges two points of error.  Stork asserts that the ALJ's assessment of her residual

functional capacity ("RFC") was not supported by substantial evidence.  Stork also argues that

the hypothetical posed to the vocational expert was flawed and, consequently, his response

should not be considered substantial evidence.

### 1.  Residual Functional Capacity

Stork argues that ALJ's assessment of her residual functional capacity ("RFC") was not

supported by substantial evidence.  The Commissioner argues that the ALJ's determination of

Stork's RFC is supported by substantial evidence in the record.  The Court agrees.

It is the ALJ's responsibility to assess a claimant's RFC based on all relevant evidence.[3] *Roberts v. Apel*, 222 F.3d 466, 469 (8th Cir. 2000). This evidence includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Nonetheless, RFC is a medical question. *Lauer v. Apel*, 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apel*, 222 F.3d 448, 451 (8th Cir. 2000). Thus, "some medical evidence" must support the determination of the claimant's RFC and include medical evidence addressing the claimant's ability to function in the workplace. *Lauer*, 245 F.3d at 704. The opinions of the claimant's treating physicians are entitled to controlling weight if they are supported by and not inconsistent with the substantial medical evidence in the record. *Stormo v. Barnhart*, 377 F.3d 801, 805 (8th Cir. 2004). However, statements that a claimant cannot be gainfully employed or is disabled are not medical opinions but legal opinions, a task assigned solely to the discretion of the Commissioner. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002).

The ALJ found that Stork had the RFC to perform the full range of work at all exertional levels while limiting her to performing unskilled work that required no contact with the general public and no more than occasional contact with coworkers. (Tr. 14.) Stork insists that the ALJ's decision is not supported by the medical evidence because the ALJ offered no rationale for his conclusion that Stork's impairments were moderate in regards to activities of daily living, social functioning, and concentration, persistence, or pace, with no episodes of decompensation. The ALJ's assessment is consistent with the medical record as he referenced the opinions of Dr. Tamuran, Dr. Rao, and Dr. Brockman. Stork was consistently diagnosed with major depression from August 2007 to October 2009. In August 2007, Dr. Tamuren diagnosed Stork with severe

---

[3] "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 at *1 (Sept. 17, 2012).

clinical depression, nevertheless anticipating she would be able to return to work "in a reasonable time." (Tr. 288.)  Dr. Brockman in November 2007 found Stork to be "doing much better," and she reported feeling "slightly less depressed and anxious" despite still having significant depression and PTSD symptoms.  Dr. Brockman noted that Stork's thoughts were goal-oriented toward problem-solving. (Tr. 263.)  Dr. Brockman also noted that Stork's mother was cooking Thanksgiving dinner but that Stork would attend and cook a dish, which are activities of social functioning and daily living. (Tr. 263.)  Dr. Brockman saw Stork again in January 2009 and noted she had impaired concentration but could still think concretely. (Tr. 282.)  While Dr. Brockman found Stork's condition significantly impacted her ADLs and that a return to UPS would escalate her symptoms, Dr. Brockman nonetheless opined that Stork should undergo vocational rehabilitation to determine whether she was capable of obtaining and maintaining employment (Tr. 284.)  These impressions are very consistent with each other, reflect a range of moderate to severe symptoms, and are identical to the ALJ's RFC assessments.

Additionally, Stork was seen numerous times by Dr. Rao, her treating physician, from December 2007 to October 2009 and, while she reported at various times feeling more depressed and anxious, he noted no changes in his diagnosis of severe major depression (single episode without psychotic features). (Tr. 192-223; 250-53; 265-77.)  Dr. Rao noted in December 2008 that Stork regularly saw to her personal care (Tr. 252) and, while she reported a decrease in her personal care in March 2009 and May 2009 (Tr. 250; 276), Dr. Rao found her ADLs "impaired but unchanged" in August 2009 (Tr. 270) and ultimately concluded in October 2009 that her ADLs were intact (Tr. 268).  Furthermore, Dr. Rao diagnosed Stork with a GAF score of 60 in August 2009 and a GAF score of 50-55 in October 2009. (Tr. 271; 269.)  This range indicates

moderate to somewhat severe symptoms.[4]  Stork contends that the medical record documents severe mental illness.  However, "where the medical evidence is equally balanced […] the [ALJ] resolves the conflict."  *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995).  The medical evidence documents both severe and moderate symptoms.  Therefore, the record contains "some medical evidence" to support the ALJ's determination of Stork's RFC.

Furthermore, evidence of Stork's daily activities bolsters the ALJ's conclusion that Stork was not disabled. ALJs must assess a claimant's RFC based on all relevant evidence, including the claimant's "own description of her limitations."  *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).  The medical record shows that Stork's ADLs were impaired but intact.  (Tr. 250; 252; 268-270; 276; 284.)  Moreover, Stork testified at the administrative hearing that she lived in her own house (Tr. 23), cleaned, cooks simple meals, (Tr. 25), had no problems with her personal care or doing her laundry, (Tr. 26), and possessed a commercial driver's license.  (Tr. 26.)  Stork also testified that her son did the grocery shopping because she did not like going out in public.  (Tr. 26.)  Such evidence may be considered in judging the credibility of a claimant's complaints. *See Nguyen v. Chater*, 75 F.3d 429, 430–31 (8th Cir.1996); *Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir.1995).  Since the ALJ properly considered Stork's daily activities when making his assessment, his conclusion that she had moderate restrictions in daily living and social functioning was not in error.

Next, Stork argues that the ALJ erred by engaging in a work motivation analysis rather than a functional analysis when assessing Stork's credibility.  Stork testified at the administrative hearing that she was actively involved in her lawsuit against UPS.  (Tr. 27-28.)  Stork told the ALJ that she was seeking reinstatement of her job as a driver (Tr. 23-24) and that she had looked

---

[4] A GAF score from 41-50 indicates serious symptoms or impairments while a score from 51-60 is indicative of more moderate symptoms.  DSM-IV 34 (4th ed. 2000).

for other work after leaving UPS.  (Tr. 32)  The ALJ could properly consider Stork's active involvement in her suit, her subjective belief that she could work, and the fact that she was actually seeking work as some evidence though not conclusive representing her availability, ability and willingness to work.  See, e.g., *Jernigan v. Sullivan*, 948 F.3d 1070, 1074 (a claimant may admit an ability to work by applying for unemployment benefits because such an applicant holds himself out as available, willing, and able to work).  As the ALJ noted, Stork's assertion that she should be reinstated to her job at UPS is inconsistent with her claim that she is totally and permanently disabled.  (Tr. 15); *See Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir.1995). Therefore, the evidence does support the ALJ's conclusion that Stork was able to work.

### 2.   Vocational Expert's Testimony

Stork contends the ALJ's hypothetical posed to the vocational expert ("VE") failed to "capture the concrete consequences" of her impairment and therefore did not accurately reflect her limitations.  The Commissioner argues that the hypothetical question presented to the VE was proper.  The Court agrees.

An ALJ's hypothetical question must fully describe a claimant's impairments *Chamberlain v. Shalala*, 47 F.3d 1489, 1495 (8th Cir. 1995). These impairments must be based on the "substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010).  If the hypothetical question is properly formulated, then the testimony of the VE constitutes substantial evidence. *Roe v. Chater*, 93 F.3d 672, 676 (8th Cir. 1996).  As noted above, the ALJ's decision had a substantial basis in the medical evidence and the record as a whole for finding that Stork was unable to perform her past relevant work but could perform unskilled work in jobs that exist in significant numbers in the national economy, which was the basis for the hypothetical.

16

Accordingly, the hypothetical question posed to the VE accurately reflected Stork's age, education, work experience, and limitations.

Next, Stork contends that the VE's testimony that a person with a GAF score of 50 would be unable to work or perform any jobs supports her conclusion that she is disabled.  (Tr. 36.) Stork failed to note that the VE also testified that an individual with a GAF score of 60 would be able to engage in unskilled work.  (Tr. 36.)  Stork's most recent GAF scores ranged from 50-60. (Tr. 271; 269.)  Therefore, the VE's testimony is consistent with the medical record and can be considered substantial evidence in support of the ALJ's finding.

Finally, Stork contends that the VE's testimony is inconsistent with the job descriptions listed in the Dictionary of Occupational Titles (DOT).  The testimony of a VE should be consistent with the DOT.  *See* Social Security Ruling (SSR) 00-4p, 2000 WL 1898704 at *2 (Sept. 19, 2012).  There does not appear to be a conflict here because the jobs identified by the VE are silent regarding interactions with the general public and coworkers.  *See* DICOT 920.687-018; DICOT 361.684-014; DICOT 653.686-026.  Furthermore, evidence from a VE can include information not listed in the DOT.  SSR 00-4p at *2.  This is because the DOT lists "maximum requirements of occupations" and "not the range of requirements" at any particular job or place.  *Id*. at *3.  Since there was no inconsistency between the VE's testimony and the DOT classifications, the VE's testimony can be considered substantial evidence.

The ALJ's findings of Stork's RFC are supported by substantial evidence.  The hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.  *See,* e.g., *Martise*, 641 F.3d 909, 927 (8th Cir. 2011).

17

## VI.
## CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the

record as a whole supports the Commissioner's decision that Stork is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Stork in her Complaint (Doc. # 1)

and Brief in Support of Plaintiff's Complaint (Doc. #9) be **DENIED** and that judgment be

entered in favor of the Commissioner.


Dated this 27th day of September, 2012.


      /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE